IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 22, 2017 Session

## STATE OF TENNESSEE v. WHITNEY KRISTINA HARRIS

**Appeal from the Criminal Court for Carter County**
**No. 21543B     Stacy Street, Judge**

_____

### No. E2016-00604-CCA-R3-CD

_____

The Defendant, Whitney Kristina Harris, was convicted upon her guilty pleas of tampering with evidence, a Class C felony, and accessory after the fact to first degree murder, a Class E felony. *See* T.C.A. §§ 39-16-503 (2014) (tampering with evidence), 39-11-411 (2014) (accessory after the fact). The Defendant pleaded guilty as a Range II offender as a term of the plea agreement and agreed to an effective ten-year sentence. The manner of service of her sentence was reserved for the trial court's determination. On appeal, the Defendant contends that the trial court erred in imposing incarceration rather than an alternative sentence. We affirm the judgments of the trial court, and we remand the case for correction of a clerical error on the accessory after the fact judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed;**
**Case Remanded for Correction of Judgment**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Gene G. Scott, Jonesborough, Tennessee, for the appellant, Whitney Kristina Harris.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel, and Zachary Harris, Assistant Attorney General; Anthony Wade Clark, District Attorney General; Janet V. Hardin and Dennis Brooks, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The Defendant's convictions relate to her actions following the homicide of Lonnie Townsend. The Defendant's boyfriend and the father of her children, Timothy Pate, was convicted of first degree murder, tampering with evidence, and abuse of a corpse relative to Mr. Townsend's death. The Defendant had been charged with first

degree murder along with Mr. Pate, but she testified as a State's witness at Mr. Pate's trial. The State amended the first degree murder charge to accessory after the fact as part of the plea agreement.

## Relevant Evidence from Timothy Pate's Trial

According to the facts shown at Mr. Pate's trial, the transcript of which was made an exhibit at the Defendant's sentencing hearing, Mr. Pate had recently lost his job, and the Defendant had recently given birth. Mr. Pate told the Defendant, with whom he shared a residence, that he had called the victim to come over and that he was going to kill the victim in order to obtain the victim's money. Mr. Pate asked the Defendant to use one of their children to distract the victim in order for Mr. Pate to attack the victim by surprise. The Defendant claimed that she did not think Mr. Pate had been serious about killing the victim. She said that she thought they could get money from their families, that she had called charitable organizations to try to obtain assistance, and that she had talked to her mother, who received a disability check, about living with them in order to provide childcare so the Defendant could work.

According to the evidence at Mr. Pate's trial, the victim came to Mr. Pate's and the Defendant's home, and the Defendant sat on a sofa with the newborn child and the victim until Mr. Pate began striking the victim with a hammer, at which point the Defendant took the child to another room, where she remained with Mr. Pate's and her other child and her mother. Mr. Pate removed the victim's wallet, took the victim's body into a bedroom, and rolled the body into carpeting, which Mr. Pate had cut from the floor. According to the Defendant, after Mr. Pate killed the victim, he told the Defendant that he would kill her if she went to the authorities. She said he also threatened to kill her mother. The Defendant said Mr. Pate obtained $500 from the victim's wallet. The Defendant claimed she felt she had no choice but to assist Mr. Pate in removing the victim's body and evidence, including a couch and carpeting, from their home and cleaning their home with bleach. She said she had been with Mr. Pate when they drove around and he threw out two hammers. The Defendant claimed that she felt she had to protect her children and her mother from Mr. Pate and said that she and Mr. Pate shared a cell phone, which he had in his possession on the day of the homicide. She said that although the victim's truck was at their house, she did not know where the keys were.

The Defendant testified that the day after the homicide, Mr. Pate gave her money and told her to go pay their electric bill and then to meet him on Spivey Mountain, where he was going to leave the victim's body. The Defendant testified that she went in her car to pay the electric bill and that she had a cell phone with her. She said that she later met Mr. Pate on the mountain, that she saw the body was no longer in the back of the victim's

truck, that she followed Mr. Pate to his mother's house, where he left the victim's truck, and that she drove Mr. Pate and herself home. She said Mr. Pate gave her money to go to a store to buy trash bags and bleach. She said that at this point, the scene of the initial attack was clean but that the bedroom where the carpet had been removed had not been cleaned. She said blood had seeped through and dried onto the flooring where the carpet had been. She said she cleaned the floor with bleach. She said Mr. Pate's only participation in cleaning the house consisted of disposing of the hammers used to attack the victim. She said that her mother had been in another room while the Defendant cleaned the house and that her mother was often intoxicated from drug use. The Defendant said that after the attack, she had put the hammers in the kitchen sink with bleach and water but did not remove them from the sink. She said that the couch was stained with blood from the homicide.

The Defendant testified that Mr. Pate had not wanted to stay at home the night after he killed the victim and that they spent the night at his ex-wife's apartment. The Defendant said that they also stayed in a Johnson City motel in the days after the homicide. She said she and Mr. Pate returned to Spivey Mountain a couple of days after she met him on the day after the homicide because he wanted to check whether the victim's body had been discovered.

The Defendant testified that Mr. Pate wanted to get away from the area "until things cooled down" on the homicide and that he concocted a story about having a job offer in Florida in order to obtain money from his relatives. She said that she, Mr. Pate, their children, and the Defendant's mother went to a beach in Florida. She said Mr. Pate told her not to contact her family. She said that she tried to be a good mother while they were in Florida but that she was concerned for the safety of her mother, her children, and herself. She said the Defendant communicated with people in Tennessee, that he learned the authorities wanted to question him and the Defendant, and that the victim's truck had been discovered. She said she relied on the Defendant to purchase items in Florida and that she had no cash or credit cards. The Defendant and Mr. Pate eventually returned to Tennessee with their children and a homeless man they met in Florida, although the Defendant's mother remained in Florida. The Defendant said that Mr. Pate planned to meet his ex-wife at her place of employment to obtain $20. The Defendant said Mr. Pate stated that he was going to Erwin to kill someone to obtain money and guns and that he wanted to become a serial killer. The Defendant and Mr. Pate were, by this time, suspects in the victim's homicide and were apprehended by the police when they arrived at Mr. Pate's ex-wife's place of employment.

The Defendant testified that she felt safe to talk to the police because they separated her from Mr. Pate. She said she wanted to do the right thing and tried to

cooperate. She said she was left alone in a room at the police station for a long time, that she became agitated, and that she spoke profanely to herself regarding the police. She did not know that recording equipment was activated in the room. She said that she tried to summon someone and that after an officer outside the room told her to sit and be calm, she cursed at him. She said that once she began talking to Tennessee Bureau of Investigation (TBI) Agent Scott Lott, she was concerned Mr. Pate might hear what she said and about what might happen if they were not kept at the police station. She said that she told Agent Lott everything and that she did not want to hold back anything. She said she rode with police officers to identify the location of the victim's body. She said that she tried to help the officers locate the hammers but that they were not recovered in her presence. She was unaware that a hammer was later found in the wheel well of her car.

The Defendant testified that after she attempted to help the police find the hammers, she gave a statement to another investigator. She did not remember that she had been alone in a room and had talked to herself but had since learned this occurred. She said she did not remember "every single word" of what she said. She said she had been upset and angry at herself and remembered saying she had "f----- up." She said she did not say anything about killing the victim. She said that Mr. Pate told her in Florida not to say anything if she were ever questioned about the victim's homicide and that she had done the opposite. After reviewing the recording, she stated that she had said, "I've done f----- everything up and I failed myself." She said she was referring to her cooperating with the authorities and her disclosure of her participation. The Defendant denied that she had been the person who struck the fatal blows.

The Defendant testified that when she was thirteen years old, she had been unruly at home, that she had run away from home, and that she had caused trouble at school. She said her parents met with her probation officer and filed a petition to have her declared unruly. She agreed that she weighed one pound, five ounces when she was born. She said that her father was away from home due to his work as a truck driver and that her mother allowed her to do what she wanted. The Defendant said she had not respected her mother. The Defendant said she was expelled after she cursed at the school principal in eighth grade. She said she had an altercation with her mother, who hit her on the face and chest with a belt after her expulsion, that the police responded, and that she was charged with aggravated domestic assault, which violated her probation for a previous unruly adjudication. She said she was hospitalized in "Woodridge" for two weeks because she stated she wanted to kill herself. She said she had been suicidal because she felt like she was "not good enough" and a failure. She said that her mother had never disciplined her previously and that when her mother hit her with a belt, she did not understand it and was angry. She said she was diagnosed with bipolar disorder and as

having depression and anxiety issues while at Woodridge. She was given medication, which she said was somewhat helpful but made her feel "like a zombie" and emotionless. She said that she was placed in the State's custody at age fourteen and that she had lived in at least six foster homes. She said she began using alcohol at age thirteen and marijuana at age fourteen. She said her substance abuse became "heavy" around age fifteen to sixteen. She said she had multiple psychiatric hospitalizations between ages fourteen and seventeen.

The Defendant testified that she was suspended from high school for fighting and that she ran away from her foster home after a disagreement with her foster parents relative to the suspension. She said that when she was almost fifteen years old, she ran away from another foster home after a disagreement with her foster father. She said that she was placed in other foster homes and that she did not feel like anyone in her biological family cared about her. The Defendant said her mother surrendered her parental rights for the Defendant. She said that she was charged with aggravated burglary that occurred on her seventeenth birthday and that she may have had other domestic violence and burglary charges. She said that her mother had been involved with her in the burglary on her seventeenth birthday and that she had cooperated with the authorities. She said she ran away from the group home in which she had been placed after the aggravated burglary. She said she met two men who took her to a "trap house" where drugs were used and prostitution took place. She said that she was taken to another house and that she worked as a prostitute for one of the men. She said that they eventually went to Nashville and that she left the man because she learned he was married and she did not want to live this way. She said she called the police and told them what had happened. She said that she was released from the State's custody at age eighteen and that she went to live with her biological mother and her mother's boyfriend. The Defendant said her mother worked as a prostitute and that the two of them posed for photographs together.

The Defendant testified that she was hospitalized in a psychiatric facility forcibly and against her will at age nineteen due to depression. She said she had written a letter about wanting men to abuse, hurt, and kill her. She said that, at the time, she was miserable in her relationship with Mr. Pate and that she did not feel like she was good enough for her then-six-month-old daughter. She agreed this occurred about one month before the victim's death and that she had been hospitalized at Woodridge as a result of the incident. She acknowledged additional psychiatric hospitalizations. She acknowledged her history of non-compliance with her prescription medication regimen and her tendency to seek illicit drugs when she was not taking her prescribed medication.

The Defendant testified that she met Mr. Pate through a mutual friend, that they drank alcohol and used drugs on the day they met, and that she began living with him the next day. She said she had nowhere else to go. She said that their first child was born about a year later and that Mr. Pate was a good father. She said she had not used drugs while she was pregnant and that she used Lortab and marijuana after the child's birth. She said Mr. Pate had two friends who lived with them and who sold drugs. She said Mr. Pate worked and provided for her until he lost his job. She said she was not taking prescription medication but that she used marijuana daily. She said she and Mr. Pate lived together for three years.

The Defendant acknowledged that she had been arrested for domestic assault relative to an altercation with her mother. She said she had pleaded guilty and had received one year's probation. She had been on probation for this offense when Mr. Pate killed the victim.

The Defendant testified that she was in jail for two years after her arrest for the offenses related to the victim's homicide and that she had been out of jail on bond for one and one-half years. She said she lived with her adoptive parents. She said she had been prescribed Lexapro for depression and anxiety but that she had not taken it for about one month because she did not think it helped. She said she did not take any other medications. She said she had not had any problems with law enforcement since her release from jail.

Mr. Pate testified at his trial that he had invited the victim to the house he shared with the Defendant for dinner and to pay the victim money they owed him. Mr. Pate claimed he and the Defendant had been arguing about the Defendant's having allowed her mother to drive their car. He claimed that after the victim arrived, the Defendant left the room, returned, began hitting the victim in the back of the head with a hammer, and continued striking him until Mr. Pate intervened and pushed her away. Mr. Pate claimed that the Defendant's mother was aware of what had occurred and that he agreed to cover up the homicide and hide the body after the Defendant's mother said they could not allow the Defendant to go to jail. Mr. Pate stated that he suggested hiding the body in a remote mountain location and making it appear as if a robbery occurred. Mr. Pate claimed that he had not planned a robbery and had removed the victim's wallet and given it to the Defendant without inspecting it. He claimed that he had no reason to kill the victim and that the victim had been his best friend. Mr. Pate said that while they were in Florida, he told the Defendant to blame everything on him to avoid their children losing both parents.

## Evidence at the Defendant's Sentencing Hearing

At the Defendant's sentencing hearing, the victim's granddaughter testified about the positive relationship she had with the victim. She said that he loved and doted on children and that he assisted elderly people. She said that the victim had had a drinking problem when she was younger but that his condition had improved until he began drinking with the Defendant and Mr. Pate. The victim's granddaughter said that at the time of his murder, the victim had a baseball-sized tumor.

The victim's granddaughter testified that a minister who befriended the Defendant had been dismissed from his church after bringing the Defendant into the church to meet the granddaughter's son. She said she received frequent calls and text messages about the minister and the Defendant having "inserted themselves into" her neighborhood. The victim's granddaughter said she and her children had to look over their shoulders when they were in public, and she questioned the fairness of their having to change their schedules and way of living to avoid the Defendant. The victim's granddaughter stated that the Defendant had never apologized to her or anyone in her family. The victim's granddaughter stated that in her opinion, a person should take responsibility for her actions and not blame her poor decisions on others. The victim's granddaughter questioned whether the Defendant had changed since the offense.

The presentence report was received as an exhibit. It reflected that the Defendant had an eleventh-grade education and some employment history. Defense counsel stated that the Defendant was employed currently at McDonald's. She reported good mental and physical health but stated she had bipolar disorder, mood swings, depression, anxiety, and sleeping problems. She reported alcohol and drug use and a history of psychiatric treatment and alcohol and drug rehabilitation. She stated that her childhood had been "dysfunctional," that she had frequently moved in and out of homes with her parents, and that she had been placed in the custody of the Department of Children's Services (DCS) when her parents surrendered their rights to her at age fourteen. She reported consistent drug use and violence in her home as a child. She reported that she now lived with her "adopted parents." She reported a prior conviction of domestic assault.

In an allocution, the Defendant stated the following: She was sorry for the victim's death and her participation after the fact in attempting to conceal the crime. The victim had been a good friend to her and her family, even providing a Christmas gift for their older child when she and Mr. Pate could not afford it. The Defendant gave birth to her second child with Mr. Pate ten days before the victim's murder. The week after the birth, Mr. Pate lost his job. On the day of the victim's murder, Mr. Pate told the Defendant that the victim was coming to their house and that Mr. Pate was going to kill

him. She told Mr. Pate that all they had to do was ask the victim or someone else for help. The events that took place in her home were a nightmare, and Mr. Pate threatened to kill her if she contacted the police or ran away. She assisted Mr. Pate afterward because she was scared and wanted to protect her children and her mother.

Brianne Murray, the Defendant's case officer for bond supervision, testified that the Defendant had reported as instructed for fourteen months. Ms. Murray said the Defendant voluntarily completed "moral recognition" therapy and relapse prevention classes. Ms. Murray said the Defendant had passed monthly drug screens except on the previous day, when she tested positive for marijuana. Ms. Murray said the Defendant had been forthcoming about smoking marijuana with a friend and had stated she had used marijuana due to stress about "the things that were coming up." She said the Defendant had been forthcoming about relevant events and had "grown a lot" in the time the Defendant had been supervised. Ms. Murray said she had been concerned about the people with whom the Defendant associated because the Defendant reported that her tires had been slashed when the Defendant came outside of a house in which she had been visiting. Ms. Murray said this incident occurred on February 13, 2016, and the sentencing hearing was on March 4, 2016. Ms. Murray said that the Defendant had been legally adopted as an adult by Mike and Robin Hyder and that the Defendant's children were in DCS custody. Ms. Murray did not think the Defendant had been permitted to visit her children since her arrest. In Ms. Murray's opinion, the Defendant would be "very successful" on probation.

The Defendant's voluminous psychiatric records were reviewed *in camera* by the trial court. The records had been subpoenaed by Mr. Pate in the proceedings against him. Although they were not received as an exhibit at the Defendant's sentencing hearing, the court stated it had reviewed them at counsel's request and referenced the contents of the records in its findings.

The trial court applied two mitigating factors, the Defendant's assistance to the authorities in uncovering the offense committed by another person or in detecting or apprehending another person who committed the offense, and the Defendant's assistance to authorities in locating or recovering any property or person involved. *See* T.C.A. § 40-35-113(9), (10) (2014). The court rejected two mitigating factors proposed by the defense: the Defendant's suffering from a mental or physical condition that significantly reduced her culpability for the offense, and the Defendant's acting under the duress or domination of another person. *See id.* § 40-35-113(8), (12). In rejecting the latter, the court noted that although the Defendant might have been afraid, initially, of Mr. Pate, she had the opportunity to call the authorities when he left their home to dispose of the

-8-

victim's body but continued to clean the scene, and when she went to Florida with Mr. Pate.

The trial court found that the Defendant's criminal history, consisting of a domestic assault conviction, was not extensive, and that this weighed in favor of granting an alternative sentence. Relative to the Defendant's psychiatric records, the court noted that the Defendant had a history of not taking her medications and that she had a history of violent outbursts. The court said that although a history of mental health concerns would normally weigh in favor of granting an alternative sentence in order to provide the opportunity for treatment, the Defendant tended to start out well but not follow through. The court said the Defendant's mental health concerns weighed "slightly" in favor of alternative sentencing. The court expressed concern relative to the Defendant's social history as an adult, noting that she began "running around with Mr. Pate" around age eighteen, using drugs, having children, and being incarcerated. The court found that the Defendant's social history weighed against granting alternative sentencing. The court was disturbed by the Defendant's actions and character before her release on bond and found that they weighed "slightly" against an alternative sentence. The court said that before learning of the Defendant's recent marijuana use, the court would have weighed the Defendant's potential for rehabilitation as high but that as a result of the marijuana use, the court weighed the factor "only very slightly" in favor of an alternative sentence. Similarly, the court weighed the Defendant's prospects of abiding by the terms of probation "slightly" in favor of granting an alternative sentence. In considering whether the interests of society were protected from possible future criminal conduct by the Defendant, the court expressed concern relative to the Defendant's choice of associates, her criminal history, and her past violent outbursts, but it nevertheless concluded that the risk of future criminal conduct was not great. In considering whether measures less restrictive than confinement had frequently or recently been applied unsuccessfully to the Defendant, the court noted the Defendant's recent pretrial incarceration of two years and her positive drug screen after her release. The court concluded that this factor weighed slightly in favor of alternative sentencing. In considering whether a sentence of full probation would unduly depreciate the seriousness of the offenses of accessory after the fact to first degree murder and tampering with evidence, the court weighed this factor heavily against the Defendant. The court found no evidence to support a conclusion that confinement was necessary or particularly suited to provide an effective deterrent.

The trial court recounted, in detail, the facts of Mr. Pate's trial. It then made the following findings:

> And all of the things that I talked about that weigh slightly in favor of the
> granting of alternative sentencing for [the Defendant] and all of the good

-9-

that she's done and . . . the right path that she's on, this court finds that they are outweighed by the facts and circumstances of this case. In order for me to deny alternative sentencing for a defendant based solely upon the facts and circumstances of the crime I must find and I'm going to quote from the . . . case law now. I must find that the circumstances of the offense as committed must be "especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive, or an exaggerated degree and that the nature of the offense must outweigh all other factors favoring an alternative sentence." Now, I'm not saying that [the Defendant] is being sentenced for First Degree Murder because she's not. She's being sentenced for . . . Tampering with Evidence and Abuse of a Corpse. [1] But, what I find is the facts and circumstances surrounding her conduct in committing these offenses, and I'm not . . . doing this because the state decided to cut a deal with [the Defendant] and she got the benefit of . . . getting a First Degree Murder charge dismissed, I'm finding that her participation in this crime, her carrying the body out, the cleaning the apartment while he's away dumping the body on Spivey Mountain, she could have called authorities. To clean that to such an extent they could find no blood, to spend a day or two it took them to get ready, to pack and then go to Florida and this court had to . . . look at fifty-some photographs, or more while she's laying in her bathing suit laughing on the beach while [the victim's] body deteriorates on Spivey Mountain. The state hammered those photographs on Mr. Pate, but this court finds that you were in those photographs, too. And those factors in the court's mind are so great that they outweigh all other factors in this case. And for that reason I find that this particular offense was horrifying, shocking, reprehensible and if there was ever conduct that would be shocking or reprehensible in relation to a Tampering with Evidence, or Abuse of a Corpse I can't think of one that would be more so than this case. To have that man killed, clean up the crime scene and leave his body to rot on a mountain while you go to the beach that's shocking to this court to the extent that it outweighs all other factors. For those reasons your request for alternative sentencing is denied. That . . . includes the denial of full probation, that included the . . . factor that the court must look at Alternative Community Corrections. And so for

---

[1] The court incorrectly stated that the conviction offenses were tampering with evidence and abuse of a corpse, although the conviction offenses were tampering with evidence and accessory after the fact to first degree murder. The court was clear in its statement, however, that it relied upon facts related to the offenses to which the Defendant pleaded guilty and not upon the facts related to the homicide.

the same reasons as I denied full probation I'll also deny split confinement. So, the request for probation is denied. The court orders the ten year sentence served.

The Defendant contends that the trial court erred in imposing incarceration rather than an alternative sentence. She argues that the facts do not support the court's finding that the circumstances of the case were horrifying, shocking, and reprehensible and outweighed all of the other factors. The State contends that the court did not abuse its discretion. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

We note, first, that the Defendant pleaded guilty as a Range II offender. As such, she was not entitled to the presumption that she was a favorable candidate for an alternative sentence. *See* T.C.A. § 40-35-102(6)(A) (2014). With regard to probation, in particular, a defendant bears the burden of establishing suitability for this sentencing alternative. *See id.*, § 40-35-303(b) (Supp. 2012) (amended 2013, 2014, 2016); *State v. Bingham*, 910 S.W.2d 448, 455-56 (Tenn. Crim. App. 1995), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

-11-

The Sentencing Reform Act provides:

(1)     Sentences involving confinement should be based on the following considerations:

(A)     Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B)     Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C)     Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

*Id.*, § 40-35-103(1)(A)-(C) (2014).   If probation is denied solely on the basis of the circumstances of the offense, they "must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring a sentence other than probation. *State v. Hartley*, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991) (citations omitted). This court has recognized, "This standard has essentially been codified in the first part of T.C.A. § 40-35-103(1)(B) which provides for confinement if it 'is necessary to avoid depreciating the seriousness of the offense.'" *Id.* at 375.

In the present case, the trial court conducted a detailed review of the facts and the relevant sentencing principles and considerations.  Although it noted some factors which favored the Defendant's bid for an alternative sentence, it found that the circumstances of the offense were "horrifying, shocking, [and] reprehensible" to such a degree that a sentence of incarceration was appropriate.  The court noted, specifically, that it was relying upon the facts surrounding the conviction offenses and not upon the facts of the homicide itself.  The court was particularly compelled by the Defendant's participation in meticulously cleaning the scene, her failure to take advantage of the Defendant's absence from the home as an opportunity to call the authorities, her failure to contact the authorities in the time before she and Mr. Pate left town, and her preparation for and participation in the beach vacation when Mr. Pate wanted to leave town following the homicide.

Upon review, we conclude that the trial court did not abuse its discretion in concluding that the circumstances of the offense outweighed the factors which favored

-12-

probation.  We conclude, as well, that the court did not abuse its discretion when it was compelled by the seriousness of the offense to conclude that any form of alternative sentencing was inappropriate.  *See id.*  The record supports the court's factual determinations regarding the underlying circumstances of the offense upon which it relied.  The Defendant is not entitled to relief on this basis.

Upon review of the accessory after the fact judgment, we note that it does not include the statutory citation to the conviction offense.  Clerical errors in judgments may be corrected at any time.  Tenn. R. Crim. P. 36.  We, therefore, direct the trial court to correct the judgment to include the statutory citation to Code section 39-11-411.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.  The case is remanded for correction of the clerical error in the accessory after the fact judgment.

_____
ROBERT H. MONTGOMERY, JR., JUDGE